

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 18, 2017

## STATE OF TENNESSEE v. JASON ERIK REDDEN

**Appeal from the Circuit Court for Rhea County**
**No. 2014-CR-96    Thomas W. Graham, Judge**

_____

**No.  E2016-00998-CCA-R3-CD**

_____

The Defendant, Jason Erik Redden, pleaded guilty to two counts of official misconduct, Class E felonies, in exchange for concurrent sentences of two years each. *See* T.C.A. §§ 39-16-402 (2014).  Pursuant to the plea agreement, the trial court was to determine the manner of service and ordered him to serve his sentence in confinement.  On appeal, the Defendant contends that the court erred by denying (1) judicial diversion and (2) alternative sentencing.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ. joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Jason Erik Redden.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; J. Michael Taylor, District Attorney General; and David Shinn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from incidents in which money and vehicles seized by the Graysville Police Department could not be accounted for or were improperly handled. The Defendant, who was the Graysville Police Chief, pleaded guilty to two counts of official misconduct with an agreed-upon effective sentence of two years, with the manner of service to be determined by the trial court.  The guilty plea transcript is not included in the appellate record.  The judgments reflect that the Defendant pleaded guilty to Counts 2 and 7 of the indictment, which describe incidents involving $3977 in seized money and storage and towing fees for a 2009 Jeep Patriot, respectively.

At the sentencing hearing, Tennessee Bureau of Investigation (TBI) Special Agent Jason Legg testified that he investigated the Defendant's case. Agent Legg said that the Defendant and another police officer seized $3977 during a traffic stop. The money could not be accounted for, and the TBI investigated the disposition of the money. Agent Legg stated that he interviewed multiple individuals during the investigation and that he listened to recordings of conversations in which the Defendant borrowed money from Robert Baldwin. Agent Legg said that the Defendant's borrowing money was related to the $3977.

Agent Legg testified that he interviewed the Defendant, that the Defendant told him City Recorder Michelle Horton asked the Defendant for the money, that the money was in a filing cabinet at the police department, and that the money had not been placed in a safe or deposited in the police "drug fund." The Defendant said he did not want Ms. Horton to know about the money. The Defendant did not tell Agent Legg that he lost the money or that he had sought to borrow money to replace it.

Agent Legg testified that he recovered a 1990 Ford Thunderbird, which had been seized and awarded to the City of Graysville, from Mr. Baldwin. Agent Legg stated that no record reflected that the money Mr. Baldwin paid for the Thunderbird was "turned into the city recorder, who would have deposited it into the drug fund."

Agent Legg testified that he found a 1997 Honda Civic, which had been seized and awarded to the Graysville Police Department, at the Defendant's house. Agent Legg identified photographs of the Civic, which was "in a garage like area with a billy goat tied to the bumper[.]" Agent Legg agreed that the hood was missing. The Defendant told him that the windows leaked and that he moved the car in order to avoid its being damaged in the city lot. The Defendant also told him that the Civic was not in the same condition as when it was seized.

On cross-examination, Agent Legg testified that his investigation involved multiple vehicles. He said that the investigation began when the district attorney's office contacted him about missing money. Agent Legg agreed that the money the Defendant borrowed from Mr. Baldwin was given to the city to replace the missing money. Agent Legg said that the Defendant immediately repaid Mr. Baldwin.

Robert Baldwin testified that he was introduced to the Defendant by a friend and that they socialized. He said that in August 2013, the Defendant and another officer came to Mr. Baldwin's house, that the Defendant asked to borrow about $4000, and that the Defendant told him money was missing. Mr. Baldwin stated that four or five hours later, the Defendant returned the borrowed money. Mr. Baldwin said that six months before he loaned the Defendant money, he purchased a Thunderbird from the Defendant for $300 in cash and that the Defendant told him a loan company owned the car and did not want to pay storage fees for it. Mr. Baldwin stated that he did not obtain a receipt and

that he had possession of the Thunderbird at the time of the hearing. Mr. Baldwin said that he did not drive the Thunderbird, that he did not have its title, and that the TBI told him not to do anything with it.

Mr. Baldwin testified that he previously bought two guns from the Defendant. The Defendant told him that one gun belonged to the Defendant, that the other gun belonged to the city, and that the city gave the Defendant permission to "get rid of" the gun because it was not functional. Mr. Baldwin said he paid the Defendant $600 in cash and did not obtain a receipt. Mr. Baldwin stated that the TBI later confiscated the gun belonging to the Defendant and that he returned the other gun to the Graysville Police Department. Mr. Baldwin said that he had not spoken to the Defendant since he purchased the guns.

On cross-examination, Mr. Baldwin testified that he considered the Defendant a friend, that he trusted the Defendant, that he believed the Defendant to be a truthful person, and that when the Defendant promised to do something, the Defendant did it "[m]ost of the time." Mr. Baldwin agreed that the Defendant came to his house with another officer, that the Defendant was upset, and that the Defendant told Mr. Baldwin he had misplaced some money. Mr. Baldwin agreed that the Defendant said he would give collateral to secure a loan and that the Defendant intended to use the money to replace the lost money. Mr. Baldwin said that when the Defendant returned the borrowed money, the Defendant stated he had found the lost money. Mr. Baldwin agreed the Defendant told him that the Thunderbird belonged to the police department and that the Defendant was authorized to sell it. Mr. Baldwin said that he paid the Defendant in cash because he had done so in other transactions and that he did not ask the Defendant for a receipt. Mr. Baldwin did not know what the Defendant did with the money. Mr. Baldwin said that he was aware the Defendant was "not on the best of terms" with Ms. Horton and other city officials.

Sequatchie County Sheriff's Deputy Lee Spain testified that he previously worked as a Graysville police officer and that in April 2014, he recovered a stolen pickup truck. He said the truck, which was locked, was towed to a parking lot behind the police department. Deputy Spain stated that he photographed the truck and that the truck's keys were recovered during the execution of a search warrant. Deputy Spain denied having possession of the keys or entering the pickup truck. He said that a blue toolbox was visible on the passenger side of the truck and that one or two days after the truck was towed, the toolbox was missing. Deputy Spain stated that the Defendant took the keys to the police department and that Brian Crowe and Detective Rick Anderson conducted an inventory of the truck's contents.

Former Graysville police officer Brian Crowe testified that he was familiar with the pickup truck Deputy Spain recovered and that the truck was locked when it arrived at the police department. Mr. Crowe said that he gave the keys to the Defendant and that

Mr. Crowe and Detective Anderson later inventoried the truck's contents. Mr. Crowe stated that a toolbox in photographs of the truck was not inside the truck when they performed the inventory. Mr. Crowe said that the parking lot had a surveillance camera and that in the video recording, the Defendant left the police department, walked across the parking lot, opened the truck's passenger side door, closed the door, walked to his "take-home patrol car" carrying a toolbox, and placed the toolbox in his car. Mr. Crowe said that the Defendant did not tell him about taking the toolbox and that Mr. Crowe showed TBI agents the video recording. Mr. Crowe stated that the Defendant became aware of the TBI investigation and that the toolbox "reappear[ed]."

On cross-examination, Mr. Crowe testified that he was in charge of inventory at the police station and that he frequented the evidence room. He said that several weeks or months after the Defendant took the toolbox, Mr. Crowe noticed it in the evidence room. Mr. Crowe said that he did not ask the Defendant about the toolbox. Mr. Crowe stated that he did not know whether the toolbox had been kept in the Defendant's police cruiser and that the police cruiser was city property.

Samantha Redden, the Defendant's wife, testified that they had been married for ten years and that their two children and that Ms. Redden's son from a previous marriage lived with them. She said that they moved out of Graysville a month before the hearing. She stated that the Defendant did not drink alcohol or use drugs, that he had never needed mental health counseling, that their marriage was "[t]he best," and that the Defendant was her best friend. She said that she was the Defendant's "biggest champion" and that they had never separated, although the investigation and the court proceedings had been stressful. She stated that the Defendant's health was good other than being "very stressed."

Ms. Redden testified that their seven-year-old son had "very significant health problems" since his birth. She said that her son used a feeding tube until age six, that he had undergone three open-heart surgeries, several stomach surgeries, and other emergency surgeries, and that she anticipated his needing more surgeries to survive. She stated that the year before the hearing, her son underwent emergency surgery to repair a torn leak in his heart. Ms. Redden stated that if her son were hospitalized, he would not heal as quickly as a normal child due to inadequate blood flow. She said that her son's care was expensive.

Ms. Redden testified that she did not work before the investigation, that she began working part time before the Defendant's termination from the Graysville Police Department, and that she worked full time as an office manager at the time of the hearing. She said that the Defendant cared for their son, which was "more than a full-time job," and that only a certified nurse could babysit. Ms. Redden stated that they could not afford a nurse if the Defendant went to jail. She stated that neither she nor the Defendant had family in Rhea County and that the Defendant cared for the children full time. She

said that the Defendant took the children to school and their son's numerous doctors' appointments and that the Defendant provided excellent care. Copies of their son's medical records were received as an exhibit.

Ms. Redden testified that the Defendant began working at Graysville Police Department in late 2008 after their son's birth and that the Defendant maintained his position until his employment was terminated in March 2015. Ms. Redden said that the Defendant "held police work and serving his community to the highest degree," that the Defendant spent more time helping the community and other officers than he did at home, and that as a result of his termination, "it's like a part of his soul is missing." She said,

> He was extremely saddened that this took an effect on the city and on the people that he tried so hard to help. He was sad that our family had to go through this . . . [and that] he can't be there for [people who came to him for help] any more, and he just felt really sorry.

Ms. Redden testified that the Defendant had attempted to find work and that the pending charges prevented him from obtaining employment. She said that the Defendant had been a full-time student pursuing an online bachelor's degree in criminal justice and that the Defendant would graduate within the next six months. Ms. Redden stated that because they were a single income family living "paycheck to paycheck," she would have noticed any change in income or extra money and that she did not encounter any extra money.

Ms. Redden testified that she did not know of any circumstances which would affect the Defendant's ability to follow the rules of probation. She agreed that his daily life was spent devoted to the children and to his education. Ms. Redden said that she had been a Graysville city commissioner before the Defendant became police chief and remained in that position until about a year after he became chief. She stated that she abstained from the commission's vote to hire the Defendant. She said that the Defendant had never previously been the head of a city department, that the Defendant requested more certification and continuing education classes, and that the city recorder told him the city's budget did not allow for additional classes.

On cross-examination, Ms. Redden testified that she served on the Graysville city commission from 2010 until 2012. She said that when the Defendant was indicted, the city placed him on a leave of absence, that he returned to work after one or two weeks, and that he was given back pay. Ms. Redden agreed that the commission and the mayor voted to appoint police officers and that the mayor did not have the independent authority to hire and fire. She said that in 2015, the city recorder and the mayor gave the Defendant a letter of termination.

Ms. Redden testified that her son had heart issues from early 2013 until early 2014. She admitted she was not with the Defendant all day but said that she was attentive to her bank account and that she did not see an influx of $2300 in March 2013. She stated that she and the Defendant had a joint checking account, that she would have noticed if $4000 had been removed from the account, and that no such withdrawal occurred. She stated that she began working full time in July 2015.

Ms. Redden testified that she did not know the details of the Defendant's resignation from the Chattanooga Police Department and that the Defendant told her he "did not like some of the things that were happening within the department." She said that a person caring for her son would require "extensive training," that she had an associate's degree in surgical technology, and that the Defendant had extensive CPR and first responder training. She stated that she and the Defendant had custody of the Defendant's two daughters from a previous marriage and that one of them left the family home when the daughter was age eighteen.

On redirect examination, Ms. Redden testified that her father worked full time and could not assist her with childcare. Ms. Redden said that the Civic had been stored by the city before she was a commissioner, that it had been exposed to the elements and was infested with rats, that it was not drivable, and that it was in the same condition when it was towed to her house as it was in the photographs. Ms. Redden agreed that the Defendant was Peace Officer Standards Training (POST) certified. She said that the Defendant had received unemployment benefits for two months but no longer received them.

The Defendant testified that he did not work and that primarily, he cared for his children. He said that he did not know how much longer his son would live. He said that his daughters from his first marriage lived with him and Ms. Redden during the time he was employed at the Graysville Police Department. He said that his first wife did not pay child support and that he did not request child support. He stated that after he was indicted, his seventeen-year-old daughter was threatened at school and that out of concern for her safety, he allowed her to live with her mother. The Defendant said that despite the change in custody, he and his first wife agreed he would not pay her child support.

The Defendant testified that he was a full-time student and expected to receive his bachelor's degree in criminal justice by the end of the summer. He said that he had attempted to find work, that he needed to find work that allowed him and Ms. Redden to work opposite schedules, that he did not know anyone who could assist them with their son's care, and that they could not afford to hire a caregiver.

Upon examination by the trial court, the Defendant testified that he received Social Security disability benefits for his son's condition and that he did not receive other

financial assistance.  The Defendant stated that he previously worked as a building maintenance supervisor and rehabilitation coordinator and that if he could find a position with a sufficient salary, Ms. Redden would quit her job and stay home to care for their son.

The Defendant testified that he was placed on leave for one month after his indictment and that he was reinstated with back pay before his eventual termination in March 2015.  The Defendant said that $3977 was seized during a drug arrest, that he kept the money in a locker in his office, and that the money was misplaced.  The Defendant stated that he approached Mr. Baldwin for a loan when he discovered the money was missing, that Mr. Baldwin loaned him $3977, and that he returned the borrowed money because he located the missing money.

Upon examination by the trial court, the Defendant testified that he found the money in another folder in the locker.  The Defendant agreed that "that's terrible financial management to stick money in just a box somewhere . . . that's so nondescript that you don't know where it is."  The Defendant admitted that he could have deposited the money into a city bank account.  He said that the seizure happened late in the day and that he forgot the money was in the locker.  The Defendant stated that at the time he borrowed money from Mr. Baldwin, he did not have the funds to repay him.  The Defendant said that he borrowed money because he felt responsible for solving the problem.  He stated that losing the money was the basis for his guilty pleas to official misconduct.  He said that his salary was $33,000 annually and agreed that $4,000 was a significant sum to him.  He stated that Ms. Horton asked him about the money two or three weeks after he put it in the locker and that he searched for it before approaching Mr. Baldwin.

The Defendant testified relative to the Thunderbird that the lienholder did not want to take possession of it, that the Defendant spoke to Ms. Horton, that she told him to "have it scrapped or sell it or do whatever," and that he was authorized to convey the Thunderbird.  The Defendant said he gave Ms. Horton the money that Mr. Baldwin paid him.  Relative to the toolbox, the Defendant stated that the tools were used during the theft of the truck and that he took the toolbox in order to ask a suspect's relative whether the tools belonged to the suspect.  The Defendant said that he placed the toolbox under his desk at the police department.

The Defendant testified that his relationship with his wife was good and that if he were placed on probation, he would remain in the county and follow any rules imposed by the trial court.  He denied having alcohol or drug issues and receiving mental health treatment.  He said that he was in good physical health.  When asked what effect the case had on him, the Defendant said,

[T]he entire situation has been rough for me [because] . . . they put me in the position of chief of police, because . . . they felt that I would do the right thing and make the right decisions. I've, obviously, failed at that. My officers believed in me . . . , my community believed in me; my commission believed in me and I failed every one of them. It's been a very hard thing for me to handle.

The Defendant said that he accepted responsibility and did not blame anyone else for his mistakes.

On cross-examination, the Defendant testified that he and Detective Shawn Shelton seized $3977 during a pseudoephedrine arrest, that the arrest occurred around 3:00 p.m., that the Defendant took the money to the police department and obtained seizure paperwork, and that he placed the money in the drawer of a locked cabinet. The Defendant did not remember the mayor's confronting him about the seized money two days later but said he would not dispute the mayor's recollection of events. He said that he did not think about the money until Ms. Horton asked him about it.

The Defendant testified that generally, seized money was given to Ms. Horton within twenty-four to forty-eight hours and that either he or Ms. Horton took the money to the bank, obtained a cashier's check, and placed the check in Ms. Horton's safe. The Defendant denied that $3977 was the most he had seized during a drug arrest, although it was the most he had seized as police chief. The Defendant agreed that on August 20, Ms. Horton confronted him about the money. The Defendant denied telling Ms. Horton he had not seized any money and "recreating" a seizure form showing no money was seized. When asked whether he showed Ms. Horton a seizure form before shredding the form, the Defendant responded that he showed Ms. Horton the form for which she asked, that he did not shred a seizure form, and that he did not know why a form had been found by the TBI in his shredder. When asked whether he believed someone planted the shredded document, the Defendant said, "No, I'm not saying that, but I know I did not put it in there." When asked whether the mayor and Ms. Horton were lying when they said the Defendant showed them a document reflecting no seizure of money, the Defendant said that he did not remember showing them the document but that it could have happened.

The Defendant testified that he did not tell Ms. Horton or Agent Legg he had misplaced the money, that he did not want to talk to Ms. Horton about the money, and that he told Agent Legg he did not think the money was "any of Ms. Horton's business." The Defendant agreed that Agent Legg wrote the Defendant's statement, which the Defendant signed. The Defendant said that the statement recounted Ms. Horton's calling the Defendant into her office, telling him "that she had complaints on Detective Shelton," and asking him where the money was located. The Defendant said in the statement that he denied knowing to what Ms. Horton referred, although he knew to what she referred,

-8-

"but it was an open investigation and I did not feel she needed to know." The Defendant agreed that Ms. Horton approached him three weeks after the money was seized.

The Defendant said in the statement that Ms. Horton approached him later in the day and said she would call the TBI if the money were not recovered, that the Defendant took Detective Shelton to a landfill looking for the money, and that when they arrived at the landfill, "everything had already been covered up."

The Defendant testified that he thought he might have thrown the money away when he cleaned his office two days previously. He agreed he lied to Ms. Horton and to Agent Legg. He said that he lied to Agent Legg because he thought he would lose his job. The Defendant agreed that although he lost his job, he was rehired with back pay. The Defendant said that he visited Mr. Baldwin, borrowed money from him, and subsequently found the missing money. The Defendant stated that he gave the money to Ms. Horton the next day. The Defendant denied taking the money for his own benefit.

Relative to a 2009 Jeep Patriot, the Defendant testified that it was seized and awarded to the lienholder. He said that he told the lienholder the storage and towing fees had to be paid in cash. The Defendant stated that the lienholder had a second-party check and that he told the lienholder to bring a cashier's check or cash because the city had problems previously with checks returned for insufficient funds. The Defendant said that Ms. Horton instructed him not to take second-party checks. The Defendant did not know the city register reflected no insufficient-funds checks involving seizures. The Defendant stated that he obtained $2325 from the lienholder, that he gave the lienholder a receipt, and that he generally gave money from seized vehicles to Ms. Horton, although he did not remember doing so in this instance. The Defendant said that when he submitted money to Ms. Horton, he did not verify that Ms. Horton deposited the money. The trial court questioned the Defendant about whether the Defendant remembered what he did with the cash, and the Defendant responded that he did not remember because of the passage of time.

Relative to a 1994 Ford Mustang, the Defendant testified that the car was seized from Alice Collins's boyfriend, that Ms. Collins asked if the Defendant would return the car because she "was in hard times," and that the Defendant gave her the car. When asked whether he followed proper procedure, the Defendant said that he did not remember whether the car had been "awarded" at that time but that seizure paperwork had been submitted to the Department of Safety and that to his knowledge, his actions did not comply with procedure. The Defendant stated that a city commissioner, who was also the Defendant's landlord, asked him to return the car to Ms. Collins and agreed that Ms. Collins's boyfriend "did some work" for the commissioner. The Defendant said that he did not remember returning a 1999 Isuzu Rodeo to a man in exchange for $600. The Defendant stated that he returned vehicles to their owners if the vehicles had been seized and awarded to the owners and that he would not have returned a vehicle to an owner to

whom it had not been awarded. Relative to the Thunderbird, the Defendant said that it had been awarded to the lienholder and that the lienholder was to convey the title to Mr. Baldwin.

The Defendant testified that he obtained custody of his daughters in 2010 and 2011 and that before this time, he paid child support to his first wife. He thought he was current in his child support payments but was uncertain because his paycheck was garnished. The Defendant stated that he did not know he was being prosecuted in Hamilton County for being $21,000 in arrears on child support payments. He said that he had never been to court in Hamilton County regarding a child support issue. The Defendant agreed that in 2012, he entered into a parenting plan with his first wife.

The prosecutor read from the parenting plan that the Defendant's first wife had been ordered to pay $475 per month child support, that the Defendant was in arrears on his previous child support obligation, and that the Defendant's first wife's child support payments were to be credited each month toward the Defendant's arrearage until it was paid in full. The Defendant did not remember any of these terms but identified his signature on the document. The Defendant denied returning to court in 2014 and said that he signed documents and that his first wife "took care of it." He said that they agreed not to pay one another child support and that he was not told about any remaining arrearage. He agreed that he testified his first wife had never paid child support and that she had never been obligated to pay him child support.

The Defendant agreed that the presentence report detailed five incidents investigated by internal affairs while he was a Chattanooga police officer. One of the incidents, dated August 9, 2004, "alleged policy violations [and] untruthful[ness] in an internal affairs investigation." The Defendant said that the complaint was sustained and that he was suspended for twenty-eight days and the charge of untruthfulness was dismissed, although the presentence report reflected a fourteen-day suspension and a sustained complaint for untruthfulness. The Defendant read from a September 30, 2004 letter that documented the outcome of a disciplinary hearing, which was consistent with the contents of the presentence report. The Defendant said that he received another letter imposing a twenty-eight-day suspension and that the untruthfulness charge was dismissed. The Defendant agreed that he did not appeal the decision.

When asked about the final incident in which he was found to be in violation of the ride-along policy, the Defendant testified that he was questioned by an internal affairs investigator about the conduct of a police sergeant, not about his own conduct. The Defendant agreed that he responded to disorderly conduct call at a bar, that the bar's manager told him the sergeant had raped a woman who was an exotic dancer, and that the Defendant previously had a relationship with the woman. The Defendant agreed that the sergeant also responded to the call, that after the call had been handled, the Defendant spoke to him about the allegation, and that the sergeant admitted having intercourse with

the woman. The Defendant did not remember discussing with the investigator the woman's level of intoxication on previous occasions. The Defendant agreed that on one or two occasions he had intercourse with the woman in his police cruiser while he was off duty, which was the basis for the charge of conduct unbecoming a police officer. The Defendant said that the woman rode in the Defendant's and the sergeant's police cruisers and that this was the basis for the ride-along policy violation.

The Defendant testified that he told his probation officer he resigned from the Chattanooga Police Department "because [he] didn't want to throw [his] sergeant under the bus." The Defendant said that if a police officer resigned during a police investigation, the officer lost his post. The Defendant stated that he resigned in May 2005.

The Defendant testified relative to a gun he sold to Mr. Baldwin that the city commission or Ms. Horton gave him permission to sell it. The Defendant denied that he received orders to destroy the gun. He said that the other gun did not belong to the city and that he had owned the gun since he worked in Chattanooga. The Defendant stated that he gave Mr. Baldwin a receipt after the sale. On redirect examination, the Defendant said that the sentencing hearing was the first time his selling the two guns to Mr. Baldwin had been mentioned as an issue.

The presentence report was received as an exhibit and reflected that the Defendant was age forty-two and was pursuing a college degree. The Defendant had no criminal record. The Defendant reported having little contact with his first wife and their two daughters. The Defendant reported that he worked for the Chattanooga Police Department from 2002 until 2005, when he resigned because he was "unwilling to roll over on his sergeant."

In the "employment information" section, the presentence report listed five incidents investigated by the Chattanooga Police Department Internal Affairs Division. Two of the incidents were declared unfounded, and the remaining three were as follows:

> On 8-9-2004, [the Defendant was] alleged to have policy violations and untruthful in an internal affairs investigation. On 9-15-2004, those charges were sustained and he was suspended for 14 days.
>
> . . . .
>
> The fourth was alleged on 9-2-2004 and he was said to be insubordinate and policy violation. On 1-18-2005, those were sustained and he was placed on probation.

-11-

The last one was dated 5-7-2005, and it was alleged that he had conduct unbecoming and violation of the ride along policy. These disciplinary actions were sustained on 6-1-2005. This is the same day he resigned and stated "dissatisfaction with job/working conditions."

Graysville Mayor Ted Doss submitted a victim impact statement, which reflected the following:

[T]he actions of [the Defendant] have stunted the progress of our city. We have had loss of jobs such as: police officers, Judges, City Attorney and City Recorder. For the citizens of Graysville, it has caused fear and embarrassment. I have witnessed the City employees working under great stress, fear and embarrassment. My family and I have lived under stress and fear of being pulling over and wrongly accused or of leaving our home unattended for fear that someone would destroy something.

Agent Legg submitted a statement summarizing that the Defendant borrowed money from Mr. Baldwin to replace seized money "that had either been misplaced or taken" and that the Defendant attempted to cover up the missing money by misleading city officials and forging a Tennessee Department of Safety notice of seizure form. Agent Legg also stated that the Defendant was not forthcoming with him and that the amount of the missing money was $4128. Agent Legg listed three vehicles that were "mishandled" by the Defendant and stated that the Defendant collected towing and storage costs in cash from several individuals, that the money had never been deposited with the city, and that the discovery of the money was more difficult. Finally, Agent Legg stated that the Defendant attempted to obtain payment from another person for towing and storage fees for a vehicle that had not been "adjudicated by the Tennessee Department of Safety legal division."

After hearing argument from the parties relative to whether the Defendant qualified for diversion, the trial court found that the Defendant was an appointed person in the executive branch who used his official capacity to commit the offenses and that under such circumstances, the Defendant was not eligible for diversion. The trial court found that "[m]ost every chief of police I ever heard of was appointed." The court noted that even if the Defendant were eligible for diversion, the offenses involved a position "of highest public trust, an officer of the law dealing in matters of property that has been confiscated in matters involving the trust of that officer and the trust between him and his other police officers." The court did not believe the Defendant would satisfy the requirements for diversion.

The court found that the Defendant had no criminal record, had not committed additional offenses, and had no drug dependency. Relative to the circumstances of the offense, the court found that the offense was "shocking" and that the Defendant was the

-12-

highest law enforcement officer in the community and held a higher position of trust than a police officer. The court found that the Defendant was not credible, particularly regarding the Defendant's expressed lack of memory of events that should have been memorable to him, and that the Defendant lacked candor and truthfulness. The court noted relative to the automobile transactions and seized money, "Those are items that any human being[,] unless they're . . . suffering dementia or something, or on drugs, would certainly have some memory of and . . . every time he got into a squeeze he came with 'I don't recall[,]' and it was too many times."

The trial court found that the Defendant's record as a Chattanooga police officer weighed against a good social history. The court found that the Defendant's amenability to correction was "in doubt, because of all the problems that he already has and because . . . his responses here at this hearing today were bad." The court denied diversion.

Relative to alternative sentencing, the trial court found that the Defendant had pleaded guilty to Class E felonies and was eligible for alternative sentencing. The court found that "by agreeing to the top of the sentence he's already agreed that there are more enhancing factors than there are mitigating factors by the very nature of what's pled to." The court found that the offenses involved multiple victims, that the offenses involved money "accepted maybe for reasons that were not authorized in law," that no attempt was made to clear titles to the vehicles before selling them, and that the owners of the vehicles may not have been required to pay the city. The court found that the Defendant abused a position of public trust, although "to some extent" the factor was included in the elements of the offense.

Relative to mitigating factors, the trial court found the Defendant had not presented evidence that he committed the offense out of concern for his family or that he used the money to help his family. T.C.A. § 40-35-113(7) (2014). The court noted that the Defendant's conduct did not threaten or cause physical harm but that "this was a different kind of a crime." *Id.* § 40-35-113(1) (2014). The court found that the Defendant did not help the authorities recover the property and that although the Defendant attempted to repay the $3977, he did so when "he apparently felt threatened." *Id.* § 40-35-113(10) (2014). The court found that the Defendant's truthfulness was "woefully lacking" and that the Defendant generally did not admit to committing the offenses to which he pleaded guilty. The court noted that the presentence report, the Defendant's physical and social history, the circumstances of the offense, and the Defendant's prior criminal history had already been stated on the record during its findings regarding diversion. Relative to enhancing factors, the trial court found that the Defendant abused a position of public trust, although "to some extent" the factor was included in the offense. *Id.* § 40-35-114(14) (Supp. 2015) (amended 2016, 2017).

The trial court found that the need to protect society from the Defendant was not a strong factor weighing against him, that the Defendant had bad prior conduct and a lack

of truthfulness, that the Defendant believed he could regain employment as a police officer, and that the court did not "see any way that we could do anything that would enhance his ability to put the uniform back on. He's messed up bad, and it's not going to change." The court found that confinement was necessary to avoid depreciating the seriousness of the offense and to deter police corruption.

The trial court noted its disagreement with regulations allowing release before a sentence had been served, and the prosecutor noted that the Defendant would serve six-tenths of one year before being released on probation. Defense counsel argued that any confinement would be "devastating" for the Defendant's family, given their son's health issues. The court found that the Defendant's plea agreement provided for "a very lenient sentence," that the sentence should reflect the Defendant's pleading guilty to two crimes, that the behavior encompassed many episodes, and that confinement was "not too much for what went on here[.]" The court noted that a shorter sentence would put the Defendant in the county jail where other inmates "might not be his best friends," and that the court felt it better to send the Defendant to the Department of Correction. The court found that given the seriousness of the offenses and the relatively short effective sentence, confinement was appropriate. This appeal followed.

As a preliminary matter, we note that although the guilty plea transcript is not included in the appellate record, the record is sufficient for a meaningful review of the issues presented. *See Caudle*, 388 S.W.3d at 279 (holding that when a guilty plea transcript is not present in the appellate record, this court should "determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in [*State v. Bise*, 380 S.W.3d 682 (Tenn. 2012)]").

# I

## Denial of Diversion

The Defendant contends that the trial court erred in denying judicial diversion, arguing that the Defendant is a qualified defendant as defined in Tennessee Code Annotated section 40-35-313 because he was an at-will city employee, not an appointed public official, and that the court did not articulate its reasoning for every required factor before denying diversion. The State responds that Ms. Redden testified as a former city commissioner that the commission "appointed" the police chief and that as a result, the trial court did not abuse its discretion.

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp.

-14-

2013) (amended 2014). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent case law affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

A defendant is disqualified if the defendant is

> (b) . . . [S]eeking deferral of further proceedings for any offense committed by any elected or appointed person in the executive, legislative or judicial branch of the state or any political subdivision of the state, which offense was committed in the person's official capacity or involved the duties of the person's office;

T.C.A. § 40-35-313(a)(1)(B)(i)(b) (2014) (amended 2015). "Elected or appointed person" is not further defined. We note that the definition of "public servant" in the official misconduct statute encompasses a broader category than a qualified defendant in Code section 40-35-313(a)(1)(B)(i)(b). *See* T.C.A. § 39-16-401(3)(A) (2014) ("'Public servant' means a person elected, selected, appointed, employed, or otherwise designated

as . . . [an] officer, employee, or agent of government[.]").[1]  The determination of whether the Defendant was an elected or appointed person is a mixed question of law and fact, which we review de novo.  The determination of whether the Defendant was disqualified from receiving diversion as a result of being an elected or appointed person is a question of law, which we also review de novo.

This court has concluded that "a defendant who is seeking judicial diversion bears the burden of showing the trial court that the defendant is in fact statutorily qualified for judicial diversion." *State v. Jonathan Ray Sender*, No. M2009-01713-CCA-R3-CD, 2010 WL 4398720, at *4 (Tenn. Crim. App. Nov. 8, 2010), *no perm. app. filed*.  Because the record reflects that the Defendant pleaded guilty to Class E felonies, provided a TBI certificate of eligibility for diversion, and was not seeking deferral for a sex offense, the State had the burden of proving the Defendant was statutorily disqualified by his position as police chief.

The record reflects that at the sentencing hearing, the following exchange occurred between the prosecutor and Ms. Redden:

Q  . . . [T]he city council actually is the one that hires the police officers, is that right?

A  Yes.

Q  They're the ones that appoint officers?

A  Uh-huh.

No additional evidence was presented regarding whether the police chief was an elected or appointed person.

Although Ms. Redden acknowledged that police officers were appointed or hired by the city council, no evidence was presented showing that the Graysville Police Chief was a position that would have rendered the Defendant disqualified for purposes of diversion.  Because Ms. Redden agreed with both parties' characterizations of the nature of the Defendant's employment and no additional evidence was introduced relative to this issue, the record does not contain substantial evidence to support a finding regarding the Defendant's status as an elected or appointed person.  The evidence is, therefore, not sufficient for the trial court to have rendered a conclusion that the Defendant was disqualified from receiving diversion.

---

[1] *See also* The Scope of the Phrase "Elected or Appointed Person" in Tenn. Code Ann. § 40-15-105(a)(1)(B)(iii)(h), Op. Tenn. Atty. Gen. No. 17-05 (Jan. 19, 2017) ("'Elected or appointed person' . . . includes only public employees who have been elected or appointed to their respective positions[.]") .

We note that the court relied upon its experience that "[m]ost every chief of police I ever heard of was appointed," when making its determination. *See State v. Nunley*, 22 S.W.3d 282, 288 (Tenn. Crim. App. 1999) (concluding that a court may not rely on facts not in evidence and not judicially noticed when making sentencing determinations). In light of the contradictory evidence presented, the court's reliance on general knowledge not specific to the Graysville Police Department was not a proper use of judicial notice, and the court abused its discretion in this regard. *See* Tenn. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute.").

We conclude, however, that remanding the case for further proceedings is not necessary because the trial court considered the *Parker* and *Electroplating* factors before denying judicial diversion. The trial court found that even if the Defendant were eligible for diversion, the offense involved a position "of highest public trust, an officer of the law dealing in matters of property that has been confiscated in matters involving the trust of that officer and the trust between him and his other police officers." The trial court found that the Defendant had no criminal record, had not committed additional offenses, and had no drug dependency. Relative to the circumstances of the offense, the court found that the offense was shocking and that the Defendant was the highest ranking law enforcement officer in the community and held a higher position of trust than a police officer. The court found that the Defendant's record as a Chattanooga police officer weighed against a finding of a good social history. The court found that the Defendant was not a credible witness, particularly regarding his expressed lack of memory of events that should have been memorable, and that the Defendant lacked candor and was untruthful during his testimony. The court found that "the amenability to correction is in doubt, because of all the problems that he already has and because of his responses here at this hearing[.]" We note that a court's finding a defendant was not truthful is, standing alone, sufficient to support denying diversion. *See State v. Dowdy*, 894 S.W.2d 301, 307 (Tenn. Crim. App. 1994). The court noted relative to the automobile transactions and seized money, "Those are items that any human being[,] unless they're . . . suffering dementia or something, or on drugs, would certainly have some memory of and . . . every time he got into a squeeze he came with 'I don't recall[,]'and it was too many times." The court discussed the need for deterrence in its determination at the hearing. The court's discussion of the circumstances of the offense, specifically the Defendant's abusing the position of police chief, implicated whether granting diversion would serve the ends of justice. Any error in considering the Defendant's status as a qualified defendant was harmless, and the trial court did not abuse its discretion by denying diversion. The Defendant is not entitled to relief on this basis.

## II

### Denial of Alternative Sentencing

The Defendant contends that the trial court erred by denying his request for alternative sentencing, arguing that the sentence he received was contrary to the purposes and principles of the Sentencing Act because the sentence of confinement was excessive, because the court did not consider the appropriate factors before ordering confinement, and because the court misapplied enhancement and mitigating factors. The State responds that the court did not abuse its discretion.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant who otherwise qualifies for probation or alternative sentencing to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2014); *see Trotter*, 201 S.W.3d at 654.

The Defendant contends that the trial court's ordering confinement rendered his sentence "excessive under the sentencing considerations" articulated in Tennessee Code Annotated Sections 40-35-210 and 40-35-103. We note, however, that the Defendant's

brief does not discuss the trial court's application of Code section 40-35-210, but rather sections 40-35-102 and 40-35-103, and we will confine our analysis to these sections.

Relative to Code section 40-35-102, the Defendant contends that the trial court improperly relied upon a need for general deterrence and the circumstances of the offense. The trial court stated that confinement was required, "[o]therwise police corruption would be given a wide open door to operate." However, this statement occurred in the court's discussion of the seriousness of the offense, not as commentary on a need for deterrence in the Graysville community. We note that one of the principles of sentencing is "[p]roviding an effective general deterrent to those likely to violate the criminal laws of the State." T.C.A. § 40-35-102(3)(a). The record does not reflect that the court relied upon an improper factor in making its determination, and the Defendant is not entitled to relief on this basis.

The Defendant's argument that the trial court failed to consider the factors in Code section 40-35-103 is not supported by the record. During the sentencing hearing, the court stated,

> The next [factor] is confinement is necessary to avoid depreciating the seriousness of the offense, or as particularly suited to provide an effect deterrent to others likely to commit similar offenses.

> Certainly, this is a serious offense . . . . I know that a person in a position of power, when they abuse it, in that process they abuse a lot of people that are . . . under their power . . . . To not say that there is some punishment that . . . is above and beyond immediate probation ought to be applied in this case is one I just can't take. I think that confinement . . . [is] required in this case. Otherwise police corruption would be given a wide open door to operate[.]

The trial court found that confinement was necessary to avoid depreciating the seriousness of the offense. *Id*. § 40-35-103(1)(B). The Defendant pleaded guilty to two counts of official misconduct involving misappropriation of seized vehicles and money that was not deposited into city accounts. The court characterized the offenses as shocking and found that the Defendant, the highest ranking police officer in the community, had abused a position of public trust. The court noted that the Defendant pleaded guilty to two counts and that additional conduct was involved. The court found that the Defendant's testimony was not credible. We note that the court's finding the Defendant was not truthful was sufficient to deny alternative sentencing. *See Dowdy*, 894 S.W.2d at 306. We also note that the Defendant denied engaging in the behavior to which he pleaded guilty, specifically that he took the money from the sale of the vehicles and that he did so for his personal benefit. There is substantial evidence in the record supporting the court's determination that confinement was necessary to avoid

depreciating the seriousness of the offense. The court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

The Defendant also contends that the trial court erred in its consideration of enhancement and mitigating factors. Relative to mitigating factors, the Defendant argues that the court should have applied factor (7). *See* T.C.A. § 40-35-113(7) (The Defendant "was motivated by a desire to provide necessities for the defendant's family.") Although Ms. Redden and the Defendant testified about their son's substantial health issues and having financial difficulty due to medical bills, the Defendant denied purposefully taking any money or vehicles. The Defendant also never stated that he acted out of concern for his family. The testimony about their son's health was offered to establish that the Defendant's absence from the household would create a hardship on his family due to the need for a specialized caretaker. The record does not establish that factor (7) was applicable. The Defendant is not entitled to relief on this basis.

Relative to enhancement factors, the Defendant argues that the trial court erroneously applied factor (14). *See id.* § 40-35-114(14) ("The defendant abused a position of public or private trust.") The record reflects that the court discussed factor (14) and determined that "to some extent" the factor was included in the nature of the offense. Official misconduct occurs, in relevant part, when a public servant "with intent to obtain a benefit . . . intentionally or knowingly . . . [c]ommits an act relating to the public servant's office or employment that constitutes an unauthorized exercise of official power[.]" *Id.* § 39-16-402. This court has previously concluded that factor (14) cannot be used to enhance a sentence for official misconduct. *See State v. Lee Roy Gass*, No. E2000-00810-CCA-R3-CD, 2001 WL 767011, *15 (Tenn. Crim. App. Jul. 3, 2001).

It is not clear from the record whether the court applied factor (14). Any application of factor (14) was erroneous. However, the error was harmless because the trial court articulated other, valid reasons for ordering confinement. The Defendant is not entitled to relief on this basis.

The Defendant also argues that the mitigating evidence he presented, particularly his "dramatic improvement in life circumstance," his role as primary caretaker of his children, his "remorse," and his attending college classes, outweighed any enhancement factors. However, we will not disturb a trial court's weighing of enhancement and mitigating factors unless its determination "wholly departs" from the purposes and principles of the Sentencing Act. *See Bise*, 380 S.W.3d at 706. In this case, because a two-year sentence was part of the plea agreement, enhancement and mitigating factors were only considered as part of the circumstances of the offense. The court found that the offenses were shocking, that the Defendant did not admit to committing the offenses to which he pleaded guilty, and that the Defendant lacked candor and was untruthful in his testimony. The record does not preponderate against the court's determination that confinement was appropriate. The Defendant is not entitled to relief on this basis.

-20-

Relative to the Defendant's argument that the trial court improperly considered the Defendant's release eligibility, the record reflects that the court commented,

[Y]ou did your homework in working up your plea. Two years is not much under our system any more . . . . I don't agree with that . . . . They like to pass laws with lots of years of crime, and then they turn around and allow administrative regulations to release people, because they won't raise taxes to pay for the prisons. We've got a lot of folks getting released on serious stuff now because there's no place to put them, and that's what happens to these low sentences.

We agree that beneficial plea negotiations and release eligibility are not factors to be considered in making sentencing determinations and that any weight given by the court to the Defendant's status as a Range I, standard offender was improper. However, the record does not reflect the court denied probation on the basis of the Defendant's release eligibility date. Rather, the record reflects the trial court relied upon proper factors in reaching its decision. The record contains substantial evidence to support the court's determination, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE